**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

DAVID CAMP, an individual, and
LAURA BETH WALLER, an individual,

      Plaintiff,

v.

PROFESSIONAL EMPLOYEE SERVICES,
LLC d/b/a INSURANCE BRANCH, a Utah
limited liability company, and BRENDON
CASSITY, an individual,

      Defendants.

Case No. 1:24-cv-03568-RJL

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

Defendants Professional Employee Services, LLC d/b/a Insurance Branch ("Insurance Branch") and Brendon Cassity ("Cassity" and, collectively with Insurance Branch, "Defendants"), by and through counsel and pursuant to LCvR 7(a), submit this memorandum of points and authorities in support of their motion to dismiss the complaint (the "Complaint") filed by Plaintiffs David Camp ("Camp") and Laura Beth Waller ("Waller" and, collectively, "Plaintiffs") pursuant to Federal Rule of Civil Procedure 12(b)(6).

**INTRODUCTION**

Plaintiffs each assert one claim for libel (written defamation) against Defendants. But Plaintiffs' claims arise out of a classic demand letter sent to the National Organization of Social Security Claimants' Representative ("NOSSCR"). Putting a fine point on Plaintiffs' claims, Plaintiffs allege that one letter sent to NOSSCR and to each member of its 24-member board—no other communications, and no other third-party recipients—defamed them. Plaintiffs' case *is* the demand letter, period. But Plaintiffs do not attach this demand letter to their complaint. No matter:

Defendants submit an indisputably correct copy with this memorandum, and the Court can, and should, consider it. And the Court will see that this demand letter supports no libel claim.

This demand letter mentions Plaintiffs because they are—by their own allegation and admission—officers of NOSSCR, and because Defendants' concerns and grievances with NOSSCR arise directly from Camp's conduct. Those grievances pertain specifically to Camp's fundraising for the NOSSCR Foundation (the "Foundation"), a charitable organization that—again, by Plaintiffs' own allegation and admission—was authorized by NOSSCR's board of directors. So Defendants sent the demand letter to the board of directors.

This demand letter is precisely the type of communication that the judicial proceedings privilege and the common interest privilege protect. Even if those privileges are inapplicable, the Letter took great pains to simply report facts that caused Defendants concern. Several steps beyond hiding behind "opinions," Defendants expressly counseled NOSSCR to not baldly accept Defendants' statements, but to independently verify (or refute) them. Via this demand letter, Defendants reported smoke, not fire. They simply requested confirmation that the smoke didn't indicate greater danger.

In any event, Plaintiffs do not successfully allege a defamatory statement. The crux of such a statement is its verifiable falsity. But the statements upon which Plaintiffs base their claims are either classic opinions or not pleaded to be false with anything other than a conclusory allegation. Indeed, several of Plaintiffs' allegations purporting to explain the falsity of Defendants' statements are wholly nonresponsive to the demand letter itself.

Pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court is obligated to dismiss the Complaint in its entirety. Alternatively, and at a minimum, the Court should dismiss Waller's claims, as the demand letter indisputably does not accuse Waller of anything.

## STATEMENT OF FACTS

"A court considering a Rule 12(b)(6) motion to dismiss assumes all factual allegations to be true, even if they are doubtful." *Taylor v. Dist. of Columbia*, 606 F. Supp. 2d 93, 95 (D.D.C. 2009). Defendants therefore set forth the material allegations of the Complaint, which the Court deems true for purposes of this motion, but which Defendants do not admit.

A court's analysis of a Rule 12(b)(6) motion is generally confined to "the facts contained within the four corners of the complaint." *Nat'l Postal Pro. Nurses v. U.S. Postal Serv.*, 461 F. Supp. 2d 24, 28 (D.D.C. 2006). However, a court may consider, in addition, "any documents . . . incorporated into the complaint." *United States ex rel. Head v. Kane Co.*, 798 F. Supp. 2d 186, 193 (D.D.C. 2011). When assessing a Rule 12(b)(6) motion to dismiss a defamation claim, courts may consider the document containing the defamation. *See Libre by Nexus v. Buzzfeed, Inc.*, 311 F. Supp. 3d 149, 153–54 (D.D.C. 2018) (considering allegedly defamatory article without converting motion to one for summary judgment, even though article not attached to complaint). Defendants therefore assert additional facts derived from the Letter's language.

With these caveats, the "facts" material to this motion are:

1.    "NOSSCR is a specialized bar association for attorneys and advocates who represent Social Security Disability Insurance and Supplemental Security Income claimants throughout the adjudicative process." Dkt. No. 1, Compl. filed Dec. 20, 2024, ¶ 10 (on file with the Court).

2.    "NOSSCR is governed by a Board of Directors consisting of 24 leading Social Security industry professionals from all regions of the United States." *Id.* ¶ 11.

3.    "NOSSCR also retains internal employees for day-to-day operations and the implementation of strategic guidance from the Board of Directors." *Id.*

4.    "Founded in November 2022, the . . . Foundation is an organization whose mission is to further the creation of education-related resources and to raise funds for members of NOSSCR and the disabled community." *Id.* ¶ 12. NOSSCR's board of directors authorized the Foundation. *Id.* ¶ 39.

5.    Camp is NOSSCR's chief executive officer, *id.* ¶ 5, as well as the Foundation's chief executive officer, *id.* ¶ 13. He is also "an attorney licensed to practice in Missouri." *Id.* ¶ 14.

6.    Waller is NOSSCR's chief strategy officer, *id.* ¶ 6, as well as the Foundation's chief strategy officer, *id.* ¶ 15. She is also "an attorney licensed to practice in North Carolina, Washington, and Georgia." *Id.* ¶ 15.

7.    Insurance Branch is a Utah business entity that "generate[s] and distribute[s] Medicare-related insurance leads to healthcare organizations." *Id.* ¶¶ 7–8.

8.    Cassity is Insurance Branch's "sole principal." *Id.* ¶ 8.

9.    "Insurance Branch had a business relationship with NOSSCR, including sponsoring and being an exhibitor at various NOSSCR presentations, conferences, and in electronic media materials." *Id.* ¶ 18.

10.    "On or about September 19, 2024, NOSSCR terminated a Premier Exhibitor Agreement between NOSSCR and Insurance Branch." *Id.* ¶ 20. This Premier Exhibitor Agreement is referred to herein as the "Exhibitor Agreement."

11.    "In response to" NOSSCR's termination of the Exhibitor Agreement, on October 24, 2024, "an attorney representing Insurance Branch sent a letter . . . to Rick Fleming [("Fleming")], President of the Board of Directors at NOSSCR," as well as "to all 24 members of the NOSSCR Board of Directors." *Id.* ¶¶ 21, 23; *see also id.* ¶ 26. This October 24, 2024, letter is

4

defined herein as the "Letter," and a true and correct copy of the Letter is attached hereto as Exhibit A.

12.     In the Letter, Insurance Branch demanded that NOSSCR refund $81,665.00 in payments that Insurance Branch had previously delivered to NOSSCR pursuant to the Exhibitor Agreement. *Id.* at 2.

13.     Insurance Branch acknowledged NOSSCR's purported reasons for terminating the Exhibitor Agreement, *id.*, but stated that it "expects, confidently, that NOSSCR's decision [was] really a retaliatory measure responding to Insurance Branch's decision to cease funding the [Foundation], as well as Insurance Branch's alignment with Advocates, Counselors, and Representatives for the Disabled ('ACRD')." *Id.* Insurance Branch also explained that "[s]uch a retaliatory measure is consistent with the recent actions and conduct of [Camp] . . . who has engaged in a consistent, offensive smear campaign to defame Insurance Branch and [Cassity]," and that "Camp's smear campaign is likewise retaliatory in nature and purpose." *Id.*

14.     Insurance Branch then explained that it "deem[ed] it appropriate, and perhaps even useful to NOSSCR, to share" its reasons for ceasing to fund NOSSCR and to align with ACRD. *Id.* "For [that] reason," Insurance Branch explained that it sent the Letter "to all members of NOSSCR's executive committee, as well as its circuit members." *Id.* Those individuals are listed on the last page of the Letter." *Id.* at 7.

15.     The Letter explained those reasons as follows:

- On Camp's instructions, Insurance Branch delivered payments earmarked for NOSSCR and the Foundation to a hodgepodge of destinations—sometimes the same bank account for both NOSSCR and the Foundation. *Id.* at 3–4, 5. The Letter identifies these payments by date, amount, and recipient account. *Id.* The Complaint contains no allegation that these payments were not made on these dates to these accounts. *See generally* Complaint.

5

- One such destination was Essex Strategies ("Essex"). "Insurance Branch paid Essex, **Camp's personal entity**, $75,00.00 that should have gone to the Foundation, on Camp's instructions." *Id.* at 5 (emphasis in original).

- Camp represented to Insurance Branch (on behalf of NOSSCR and the Foundation) that the "express purpose of [Insurance Branch's] funding was to further education and other industry-benefitting, and industry-supporting, programs." *Id.* at 2. He secured Insurance Branch's commitment to fund the Foundation at a rate of $30,000 per month (in addition to its funding of NOSSCR) on that basis. *Id.* at 3–4. But Camp did not disclose that pursuant to his employment agreement (and that of Waller), their salaries would reach their maximum scale if the Foundation raised precisely $30,000.00 per month. *Id.* at 4. "To Cassity's knowledge, at the time Camp secured this commitment, the Foundation had no other sponsors, donors, or other revenue sources." *Id.* at 2. And "the Foundation has engaged in, at most, minimal outreach to the industry" and has "done virtually nothing." *Id.* at 3–4. Defendants became concerned that Insurance Branch was wholly funding Camp's and Waller's salaries via the Foundation, with no benefit to the industry.

- Moreover, Insurance Branch paid "not less than $268,000.00 earmarked for the Foundation on the premise that those funds were to be used for the Foundation's industry outreach and support, not Camp's and Waller's personal salaries." *Id.* at 5.

16. The Letter explained that, given these facts,

Insurance Branch lacks any confidence that *any* of the funds it thought it paid to the Foundation (or to NOSSCR, really) made it to their proper destination. At best, Camp appears to have caused NOSSCR and the Foundation to comingle funds. At worst, he affirmatively diverted funds from Insurance Branch to himself. And whatever amounts Camp succeeded in persuading Insurance Branch to pay for the Foundation's benefit, he did so by employing a false representation as to the funds' use.

*Id.* at 5 (emphasis in original); *see also id.* at 6 ("Putting a fine point on it . . . .").

17. The Letter emphasized that Insurance Branch

report[ed] only those facts of which they possess firsthand knowledge. The conclusions they draw from those facts are merely opinions based on those facts. It's certainly possible that Insurance Branch's contributions to the Foundation made it—however convoluted the path—to the Foundation, and that the Foundation used them for the purposes Camp represented. It's also possible that Camp and Waller didn't take salaries or compensation from Foundation until after July 2024. Insurance Branch does not know these facts, and nobody would be more pleased to learn them.

*Id.* at 6.

18. Insurance Branch further stated its

> express[] request that NOSSCR and its board *not* draw any conclusions based on the
> contents of this [L]etter. Instead, [it] expressly request[ed] that NOSSCR and its board
> perform their own thorough, searching, independent investigation. . . . [I]f this audit,
> and NOSSCR's investigation, reveal that Insurance Branch and Cassity have
> misinterpreted the facts that he presents herein, [Insurance Branch] will be pleased to
> be corrected—so long as that correction is documented rather than simply claimed.

*Id.* at 6.

19.     Insurance Branch also stated its expectation that "NOSSCR and the board will
likewise not disseminate this [L]etter except as necessary." *Id.* at 6.

20.     Insurance Branch therefore requested that NOSSCR refund not only $81,665.00
pursuant to the Exhibitor Agreement, but also the $268,000.00 (or more, depending on the outcome of
the requested audit) Insurance Branch paid, ostensibly to the Foundation, for industry education and
outreach. *Id.*

21.     Plaintiffs allege that the Letter contains nine (9) false and defamatory statements,
referred to herein collectively as the "Statements" and each as a "Statement." The Statements (and
the alleged reasons why each Statement is false) are numbered 1 through 9 and defined for
convenient reference in this motion as set forth at Exhibit B.

22.     None of the Statements allege or even suggest suggest that Waller has
misrepresented anything or done anything illegal, unlawful, wrong, or untoward. *See* Ex. B,
Summary of Statements.

## ARGUMENT

### I.     Governing Law, Pleading and Motion Standards, and Elements

   A.     The Substantive Law of the District of Columbia and Federal Procedural Law
          Govern Plaintiffs' Claims.

Plaintiffs each assert one claim for relief, for libel. Compl. ¶¶ 71–79 (Camp); *id.* ¶¶ 80–88
(Waller). This Court's jurisdiction is grounded in diversity. *Id.* ¶ 2; *see* 28 U.S.C. § 1332(a).
Therefore, this Court applies the substantive law of the District of Columbia. *See Nat'l Cas. Ins.*

*Co. v. Solomon*, 502 F. Supp. 3d 401, 408 (D.D.C. 2020). It applies federal procedural law. *Burke v. Air Serv Int'l, Inc.*, 685 F.3d 1102, 1107 (D.C. Cir. 2012).

B.    Dismissal Pursuant to Federal Rule of Civil Procedure 12(b)(6)

Federal Rule of Civil Procedure 12 authorizes courts to dismiss causes of action that "fail[] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "A court considering a Rule 12(b)(6) motion to dismiss assumes all factual allegations to be true, even if they are doubtful." *Taylor*, 606 F. Supp. 2d at 95. And such a court must construe the complaint "liberally in the plaintiffs' favor" and "grant plaintiffs the benefit of all inferences that can be derived from the facts alleged." *Kowal v. MCI Comms. Corp*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). But only certain allegations state claims: a court need not "accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint," or "legal conclusions cast in the form of factual allegations." *Id.*; *see Johnson v. Dist. of Columbia*, 49 F. Supp. 3d 115, 119 n.2 (D.D.C. 2014) ("[C]ourts disregard conclusory allegations at the motion-to-dismiss stage."). Qualifying "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). As explained *supra*, the Court may consider the Letter as well as Plaintiffs' allegations. *See Libre by Nexus*, 311 F. Supp. 3d at 153–54.

C.    The First Amendment and the Elements of Libel

"'Because the threat or actual imposition of pecuniary liability for alleged defamation may impair the unfettered exercise of . . . First Amendment freedoms, the Constitution imposes stringent limitations on the permissible scope of such liability.'" *Farah v. Esquire Magazine*, 736 F.3d 528, 534 (D.C. Cir. 2013) (quoting *Greenbelt Coop. Publishing Ass'n, Inc. v. Bresler*, 398 U.S. 6, 12 (1970)). "[S]ummary proceedings are essential in the First Amendment area because if

a suit entails 'long and expensive litigation,' then the protective purpose of the First Amendment is thwarted even if the defendant ultimately prevails." *Id.* (quoting *Wash. Post Co. v. Keogh*, 365 F.2d 965, 968 (D.C. Cir. 1966)).

Therefore, the First Amendment permits "liability for defamation only if, at a minimum, a defendant's statement 'reasonably implies false and defamatory facts.'" *Id.* (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19 (1990)). This principle invokes three protections:

- "[T]he First Amendment provides protection for statements that cannot reasonably be interpreted as stating actual facts." *Id.* (cleaned up). "Where a statement cannot be construed as representations of fact, there can be no defamation." *Id.* (internal quotation marks and citation omitted).

- "[A] defendant cannot be held liable unless the alleged defamatory statement or implied premise is 'verifiable.'" *Id.* (quoting *Moldea v. N.Y. Times Co.*, 22 F.3d 310, 317 (D.C. Cir. 1994)). "Where a statement is so imprecise or subjective that it is not capable of being proved true or false, it is not actionable in defamation." *Id.*

- "[A] defendant will not face liability unless the disputed statement is 'reasonably capable of defamatory meaning." *Id.* (internal quotation marks omitted).

"These threshold inquiries are questions of law for the court to decide." *Id.*

Against that constitutional background, the District of Columbia requires plaintiffs asserting libel[1] claims to allege and prove (1) "a false and defamatory statement was written by the defendant about the plaintiff," (2) "the defendant published it without privilege to a third party, (3) "the defendant exhibited some fault in publishing the statement," and (4) "the statement is actionable as a matter of law or the publication has caused the plaintiff special harm." *Beetson v. Dist. of Columbia*, 779 A.2d 918, 923 (D.C. 2001). "A statement is actionable in defamation under District of Columbia law if it is both false and defamatory." *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 627 (D.C. Cir. 2001). "A publication is defamatory if it tends to injure plaintiff in his

---

[1] Libel is defamation in written form. *See Kalantar v. Lufthansa German Airlines*, 402 F. Supp. 2d 130, 146 (D.D.C. 2005) (describing Virginia law).

trade, profession or community standing, or lower him in the estimation of the community."
*Howard Univ. v. Best*, 484 A.2d 958, 988 (D.C. 1984) (internal quotation marks omitted). However,
it "must be more than unpleasant or offensive; the language must make the plaintiff appear 'odious,
infamous, or ridiculous.'" *Id.* (quoting *Johnson v. Johnson Publishing Co.*, 271 A.2d 696, 697
(D.C. 1970)).

## I.    The Court Must Dismiss the Complaint Because the Letter Is Subject to the Judicial Proceedings Privilege.

"It is appropriate for a court, in considering a 12(b)(6) motion, to decide any preliminary
questions of absolute privilege such as the judicial proceedings privilege." *Armenian Assembly of
Am., Inc. v. Cafesjian*, 597 F. Supp. 2d 128, 140 (D.D.C. 2009); *see Smith-Haynie v. Dist. of
Columbia*, 155 F.3d 575, 578 (D.C. Cir. 1998) ("[A]n affirmative defense may be raised by pre-
answer motion under Rule 12(b)(6) when the facts that give rise to the defense are clear from the
face of the complaint."). On their face, Plaintiffs' Complaint and the Letter tee up the judicial
proceedings privilege.

The District of Columbia has adopted the judicial proceedings privilege as articulated in
the Restatement (Second) of Torts:

> An attorney at law is ***absolutely privileged*** to publish defamatory matter concerning
> another in communications ***preliminary to a proposed judicial proceeding***, or in
> the institution of, or during the course and as part of, a judicial proceeding in which
> he participates as counsel, if it has some relation to the proceeding.

*Finkelstein, Thompson & Loughran v. Hemispherx Biopharma, Inc.*, 774 A.2d 332, 338 (D.C.
2001) (emphasis added) (quoting Restatement (Second) of Torts § 586 (1977)). The privilege arises
not just from pending proceedings, "but also to parties to potential litigation that has not yet
commenced if the communication is related to the proceeding." *Marsh v. Hollander*, 339 F. Supp.

2d 1, 8 (D.D.C. 2004).[2] It also covers "statements made for the purpose of preparing for litigation, or to attempting to settle issues prior to commencing litigation." *Id.* And although the Restatement applies the privilege to attorneys, it further applies to "the range of potential participants in a legal proceeding, including attorneys, ***parties***, judicial officers, ***witnesses***, and jurors." *Marsh*, 339 F. Supp. 2d. at 8 (emphasis added).

This privilege "reflects a judgment that the need for completely free speech for litigants is dominant, and that this freedom is not to be endangered by subjecting parties to the burden of defending their motives in subsequent slander litigation." *Brown v. Collins*, 402 F.2d 209, 213 (D.C. Cir. 1968); *see Sturdivant v. Seaboard Serv. Sys., Ltd.*, 459 A.2d 1058, 1059 (D.C. 1983) (privilege "enables participants to state and support their positions without instituting a fear of retaliation, *i.e.,* an action for damages."). It is "based on the public interest in according to all men the utmost freedom of access to the courts of justice for the settlement of their disputes." Restatement (Second) of Torts § 587 cmt. a. Therefore, the privilege is "more than a defense to liability"; it affords "***absolute immunity*** from actions in defamation for communications related to judicial proceedings." *Finkelstein*, 774 A.2d at 340 (emphasis added). The term "absolute" invokes protection from liability "irrespective of [the speaker's] purpose" in publishing the statement, the speaker's "belief in its truth, or even his knowledge of his falsity." *Id.* at 338.

"For the absolute immunity of the privilege to apply, two requirements must be satisfied: (1) the statement must have been made in the course of or preliminary to a judicial proceeding; and (2) the statement must be related in some way to the underlying proceeding." *Arneja v. Gildar*, 541 A.2d 621, 623 (D.C. 1988). Applying these elements, this Court has previously dismissed

---

[2] "An 'actual outbreak of hostilities' is not required for the judicial proceedings privilege to attach." *Messina v. Fontana*, 260 F. Supp. 2d 173, 178 (quoting *Finkelstein*, 774 A.2d at 343).

defamation lawsuits pursuant to Rule 12(b)(6) based on the judicial proceedings privilege. *See, e.g.*, *Messina*, 260 F. Supp. 2d at 181. The following sections demonstrate that it should do so here.

      A.    <u>Insurance Branch Issued the Letter Preliminary to a Judicial Proceeding</u>.

Demand letters are the quintessential communication that the judicial proceedings privilege protects. *See Messina v. Krakower*, 439 F.3d 755, 760 (D.C. Cir. 2006) ("In particular, the privilege applies to written correspondence . . . concerning threatened lawsuits . . . including statements analogous to those that are often contained in demand letters." (cleaned up)); *see also Robertson v. Cartinhour*, 867 F. Supp. 2d 37, 52 (D.D.C. 2012) (privilege "applies to the demand letters which warned [plaintiff] of the litigation that eventually materialized").

The Letter is, at bottom, a demand letter. In it, Insurance Branch demanded that NOSSCR refund $81,665.00 in payments that Insurance Branch had previously delivered to NOSSCR pursuant to the cancelled Exhibitor Agreement. Ex. A, Letter at 2. Insurance Branch also demanded that NOSSCR refund an $268,000.00 that Insurance Branch had paid—whether to Camp, to the Foundation, to NOSSCR, or otherwise. *Id.* at 6. Insurance Branch also demanded that NOSSCR audit its finances to ensure that all payments made by Insurance Branch (to NOSSCR or to the Foundation) arrived at the correct destinations. *Id.*

Although the Letter does not use strong language (like "demand") or unilaterally impose a date certain to be followed by imminent litigation, such specific language is not required. As explained above, the judicial proceedings privilege covers not only strict "demands," but *any* pre-litigation communication, including settlement discussions. *See Krakower*, 439 F.3d at 760–61 (letter was "preliminary to a judicial proceeding" because "it was sent for the very purpose of attempting settlement prior to litigation" (internal quotation marks omitted)). The Letter's clear message was that NOSSCR owed Insurance Branch (1) a refund of $81,665.00 pursuant to the Exhibitor Agreement, as well as (2) a further refund of $268,000.00 due to questions arising from Camp's fundraising

activities with Insurance Branch, but that (3) the latter amount could be resolved if NOSSCR would audit that fundraising and confirm that Insurance Branch's money really went to its intended destinations. This difference in the parties' positions could be worked out informally or in court.

      B.    <u>The Letter Is Related to the Underlying Proceeding</u>.

The judicial proceedings privilege covers statements that have "some reference to the subject matter of the proposed . . . litigation, although it need not be strictly relevant to any issue involved in it." *Finkelstein*, 774 A.2d at 341–41 (internal quotation marks omitted). The "communication need not be relevant in the legal sense; the term is very liberally construed." *Arneja v. Gildar*, 541 A.2d 621, 624 (D.C. 1988). Statements need only "have enough appearance of connection with the case . . . so that a reasonable man might think them relevant." *Mohler v. Houston*, 356 A.2d 646, 647 (D.C. 1976) (per curiam). "Considering the statements in the context in which they were made, '[a]ll doubt should be resolved in favor of relevance or pertinency." *Arneja*, 541 A.2d at 624 (quoting *Young v. Young*, 18 F.2d 807, 809 (D.C. Cir. 1927)).

The Letter easily satisfies that liberal standard. Critically, the parties to the dispute described in the Letter are Insurance Branch and NOSSCR—not Camp. The Letter articulates the dispute, the parties to it, and the basis of it. Insurance Branch sent the Letter to NOSSCR to persuade NOSSCR to take certain actions, namely, to refund money and to conduct an internal audit.

Plaintiffs assert their claims because the letter references Camp as the reason why Insurance Branch ceased funding NOSSCR and aligned with ACRD, and why NOSSCR should refund $268,000.00 and submit to an audit. But the Letter references Camp because Camp was, at all pertinent times, "a member of NOSSCR's Board of Directors . . . including serving as Board President," NOSSCR's chief policy officer, or NOSSCR's chief executive officer. Dkt. No. 1, Compl. ¶ 13. Indeed, Camp alleges he is a NOSSCR employee. *Id.* ¶ 1. Defendants *cannot* explain

why NOSSCR owes Insurance Branch $268,000.00 (and maybe more), and why it should submit to an audit, *without* referencing Camp's conduct. Insurance Branch's claims against NOSSCR arise due to actions NOSSCR took via Camp, its agent. *See Trump v. Carroll*, 292 A.3d 220, 228 (D.C. 2023) (confirming adherence to formulation of "scope of employment" set forth in Restatement (Second) of Agency § 228(1)–(2)).[3] The Letter's statements regarding Camp are part and parcel of Insurance Branch's grievance, and its claim, against NOSSCR. Certainly, at a minimum, "a reasonable man might think them relevant." *See Mohler*, 356 A.2d at 647.

## II.    The Court Must Dismiss the Complaint Because the Letter Was Not Published to Any Third Party Other Than Those with a Common Interest.

"A privilege has been recognized for a statement, otherwise defamatory, made by a person who shares a common interest with the person to whom the statement is made." *Alade v. Borg-Warner Protective Servs. Corp.*, 28 F. Supp. 2d 655, 656 (D.D.C. 1998). This privilege governs otherwise defamatory statements made (1) "in good faith"; (2) "on a subject in which the party communicating has an interest, or in reference to which he has, or honestly believes he has, a duty to a person having a corresponding interest or duty"; and (3) "to a person who has such a corresponding interest." *Moss. v. Stockard*, 580 A.2d 1011, 1024 (D.C. 1990). The privilege is subject to two exceptions: (1) "excessive publication, defined as publication to those with no common interest in the information communicated, or publication not reasonably calculated to protect or further the interest"; and (2) "publication with malice, which   . . . is the equivalent of bad faith." *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 858 (D.C. Cir. 2006). Like the judicial proceedings privilege, "[t]he common interest privilege . . . is an affirmative defense, and thus the privilege may be raised at the motion to dismiss stage . . . if the facts necessary to support

---

[3] In the Letter, Defendants explained that Camp was, to them, "the face of NOSSCR and the Foundation" and "represented those entities and spoke on their behalf." Ex. A, Letter at 3.

the defense are clear from the face of the complaint." *Yazzie v. Nat'l Organization for Women*, No. 19-3845 (RDM), 2021 WL 1209347, *17 (D.D.C. Mar. 30, 2021).

On its face—and assuming the Complaint's allegations are true, and giving Plaintiffs all reasonable inferences—the Letter satisfies these criteria. NOSSCR is "a specialized bar association devoted to advocating for the disabled community." Dkt. No. 1, Compl. ¶ 1. The Foundation "is an organization whose mission is to further the creation of education-related resouces and to raise funds for members of NOSSCR and the disabled community." *Id.* ¶ 12. They are advocacy and education groups in the nature of charitable nonprofit organizations. "Insurance Branch primarily functions to generate and distribute Medicare-related insurance leads to healthcare organizations." *Id.* ¶ 8. It is a member of the industry that NOSSCR and the Foundation purport to serve. Cassity is its principal. *Id.* ¶ 9. Facially, NOSSCR, the Foundation, and Defendants all have a common interest in serving the Medicare industry.

Defendants share another common interest with NOSSCR and the Foundation: all are interested (or should be interested) in ensuring that (1) Insurance Branch contributes funds to either NOSSCR or the Foundation, (2) those funds reach their intended destination, and (3) accurate representations induced the contributions. If, indeed, one of those premises is false, NOSSCR and the Foundation should want to know. It is for that reason that the Letter describes its content as "perhaps even useful to NOSSCR," *see* Ex. A, Letter at 2, and requests, of all things, that NOSSCR audit Insurance Branch's payments to both NOSSCR and the Foundation, *id.* at 6. It is also why the Letter takes pains to explain that "if this audit, and NOSSCR's investigation, reveal that [Defendants] have misinterpreted the facts" presented in the letter, Defendants "will be pleased to be corrected." *Id.* Defendants *invited* NOSSCR to tell them if, and how, they are wrong. One of

the Letter's purposes was to *alert NOSSCR* to potential issues *within NOSSCR*, so that NOSSCR could correct them.

The Letter addressed those common interests. Therefore, even if the Letter contains otherwise defamatory content, it demonstrates—on its face, and as a matter of law—that it made those statements to serve that common interest. Fleming, who is the president of NOSSCR's board, Dkt. No. 1, Compl. ¶ 23, shared that common interest. So did the members of NOSSCR's board. *Id.* ¶¶ 21, 24.

The only defamatory vehicle Plaintiffs allege is the Letter. *Id.* ¶¶ 23–59. The only recipients of the Letter that Plaintiffs allege are NOSSCR, Fleming, and NOSSCR's 24-member board. *Id.* ¶¶ 23–25; *id.* ¶¶ 11, 21. All those recipients share the interest of NOSSCR in ensuring that funds Insurance Branch delivered to the Foundation made it to the Foundation and were obtained under accurate pretenses. On the face of the Complaint and the Letter, excessive publication has not occurred. And although Plaintiffs use the term "malice" once in the Complaint, *see id.* ¶ 59—and never the term "bad faith"—the Court need not, and should not, deem that conclusory allegation well-pleaded. *See Arpaio v. Cottle*, No. 18-cv-02387 (APM), 2019 WL 11322515, *1 (D.D.C. Dec. 3, 2019) (dismissing because allegations of malice were conclusory).

### III.    The Court Must Dismiss the Complaint Because Plaintiffs Do Not Allege a Verifiable Misstatement of Fact.

No doubt anticipating the weakness of their claims, Plaintiffs curiously allege a legal argument that "Defendants clearly intended to attempt to insulate themselves from liability for their defamatory statements" by couching their statements in the form of opinions. Dkt. No. 1, Compl. ¶¶ 60–68. The Letter indeed explain[s] that Defendants "report only those facts of which they possess firsthand knowledge," and that "[t]he conclusions they draw from those facts are

merely opinions based on those facts." Ex. A, Letter at 6. But Plaintiffs' misplaced argument ignores the rest of Defendants' explanation:

> It's certainly possible that Insurance Branch's contributions to the Foundation *made it*—however convoluted the path—to the Foundation, *and that the Foundation used them for the purposes Camp* represented. It's also possible that *Camp and Waller didn't take salaries or compensation from [the] Foundation until after July 2024*. *Insurance Branch does not know these facts*, and nobody would be more pleased to learn them.

*Id.* (emphasis added). Plaintiffs' argument also ignores Defendants' "express[] request that NOSSCR and its board *not* draw any conclusions based on the contents of this [L]etter," as well as Defendants' "express[] request that NOSSCR and its board perform their own thorough, searching, independent investigation." *Id.* (emphasis added). Plaintiffs' argument further ignores Defendants' concession that if NOSSCR's "audit, and . . . investigation, reveal that [Defendants] have misinterpreted the facts [they] present[ed]" in the Letter, they "will be pleased to be corrected." *Id.*

Contrary to Plaintiffs' pleaded argument, Defendants do not seek to "escape liability" for defamation "simply by using, explicitly or implicitly, the words 'I think.'" Dkt. No. 1, Compl. ¶ 63 (quoting *Cianci v. New York Times Publ'g Co.*, 639 F.2d 54, 64 (2d Cir. 1980)). Nor do Defendants "merely . . . couch[] [their] statements as 'opinions.'" *Id.* ¶ 64 (quoting *Hellmuth v. Efficiency Energy, LLC*, No. H-14-2945, 2016 WL 642352, *3 (S.D. Tex. Feb. 18, 2016). Instead, Defendants couch their statements as opinions *and* disclose facts that they have perceived that led them to those opinions.[4] And critically, Defendants expressly acknowledge that their opinions might be wrong, implore NOSSCR and the Foundation to *not* rely upon Defendants' statements,

---

[4] The dangers that Plaintiffs plead that may rise from "mixed opinions," *see* Dkt. No. 1, Compl. ¶ 65, are not applicable here. *See Donald J. Trump for President, Inc. v. WP Co. LLC*, No. 20-626 (RC), 2023 WL 1765193, *6 (D.D.C. Feb. 3, 2023) ("[A] mixed opinion implies that it is based upon facts which justify the opinion *but are unknown to those reading or hearing it*." (emphasis added)). The Letter discloses the facts upon which the expressed opinions are based.

and express their willingness to be corrected via the type of meaningful dialogue is supposed to be shielded from defamation liability. *See supra* Part I. There is a world of difference between, "I think Camp comingled or misappropriated funds, or falsely induced payment," and, "Here's some facts that cause us to be concerned that Camp did those things; tell us why and how we're wrong."

Even at a granular level, the Statements upon which Camp bases his claim do not "express or imply a verifiably false fact," *Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d 257, 276 (D.D.C. 2017), and are therefore not defamatory. So "that public debate does not suffer," the First Amendment protects statements "that cannot reasonably be interpreted as stating actual facts about an individual." *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20 (1990) (cleaned up). Opinions "so imprecise or subjective that [they are] not capable of being proved true or false." *Farah v. Esquire Magazine*, 736 F.3d 528, 534–35 (D.C. Cir. 2013). If a "speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts," the First Amendment protects that statement." *Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 597 (D.C. 2000) (internal quotation marks omitted).

Consider the following table, compared with Exhibit B, which demonstrates that each allegedly false Statement upon which Plaintiffs base their claims is either not a statement of verifiable fact or not adequately alleged to be false:

| Statement | Context and Explanation |
| --- | --- |
| 1 | The Letter does not misrepresent who received it. It expressly states that it was "sent to all members of NOSSCR's executive committee, as well as its circuit members." Ex. A, Letter at 2. Those recipients are listed on the last page of the letter. *Id.* at 7. |
| 2 | The Letter states that "Insurance Branch **expects, confidently**, that NOSSCR's decision [to terminate the Exhibitor Agreement] is really a retaliatory measure responding to Insurance Branch's decision to cease funding the" Foundation. Ex. A, Letter at 2 (emphasis added). That is an opinion, couched as such, *directed at NOSSCR*, that has nothing to do with Plaintiffs. Although the Letter further explains that the retaliatory termination of the Exhibitor Agreement "is **consistent**" with recent "actions and conduct" of Camp "to defame" Defendants "by disseminating |

| | |
|---|---|
| | falsehoods about them," that is plainly a legal argument—an unactionable opinion. *Id.* at 2. |
| 3 | Plaintiffs allege only that Defendants mis-identify the date upon which the Foundation was created—the Letter says March 2022, while Plaintiffs say it was created "no earlier than September 2022." But Defendants did not say the Foundation was *created* in March 2022. They said their funding "arrangement was in place by March 2022." Ex. A, Letter at 2. Although Plaintiffs imply that Defendants couldn't fund the Foundation if it didn't exist, nothing about that implication addresses whether there was an arrangement to fund a to-be-formed Foundation. In any event, even a difference as to the date the Foundation was created is not an accusation that Camp intentionally or nefariously misrepresented that date. Even if it's wrong, it's not defamatory. |
| 4 | The Letter does not dispute the existence of agreements. It states merely that "Camp's *instructions* for when, how, and how much Insurance Branch should contribute to the Foundation were *ad hoc*—the timing, amount, and method of delivery of each contribution changed from instance to instance." Ex. A, Letter at 3 (emphasis added). In any event, whether instructions were *ad hoc* is a matter of unactionable perspective and opinion. |
| 5 | The Letter does not state that Cassity was "unfamiliar" with Essex in June 2023. It merely states that in June 2023, "Cassity questioned why Camp requested funds" for the Foundation "to be sent to Essex, rather than directly to the Foundation at its PNC Bank account." Ex. A, Letter at 3. Cassity would have questioned Camp's request only if he *was* aware that Essex was separate from the Foundation—indeed. In any event, Plaintiffs do not dispute that Essex is, in fact, Camp's personal entity. Dkt. No. 1, Compl. ¶ 48. A difference of view as to the date of Cassity's awareness of Essex and its nature may indicate falsity, but not defamation. |
| 6 | The Letter does not state that "Cassity did not discover that Essex was Camp's personal entity until after November 13, 2023." Dkt. No. 1, Compl. ¶ 47. As explained with respect to Statement No. 5, Cassity obviously recognized that fact (which the Letter accurately states) much earlier. Instead, the Letter states that after November 13, 2023, Cassity "came to some disturbing realizations," including confirming via public records that Essex was, in fact, what Camp had told him it was: his personal entity. Ex. A, Letter at 5. And given that Essex is, in fact, Camp's personal entity, *see* Dkt. No. 1, Compl. ¶ 48, the date upon which Cassity learned this—whenever it was—is immaterial. The problem is the fact that Essex is Camp's personal entity—which it is. The Letter does not allege that Camp concealed this fact. |
| 7 | The Complaint alleges no basis for why this Statement is false. *See* Dkt. No. 1, Compl. ¶ 50. Camp does not dispute the Letter's characterization of his, and Waller's employment agreements with the Foundation. *See* Ex. A, Letter at 4. |
| 8 | The Letter does not accuse Camp of misrepresenting his (or Waller's) compensation *from NOSSCR*. *See* Ex. A, Letter at 3–4. Nor does it suggest that such compensation, *from NOSSCR*, was somehow improper. *See id.* Instead, it suggests that Camp concealed that his, and Waller's, employment agreements *with the Foundation* provided for compensation that depended upon exactly the financial commitment Camp elicited from Insurance Branch—even though the Foundation had no other |

| | | |
|---|---|---|
| | | sponsors and was not actually doing anything to advance its mission. *See id.* Plaintiffs do not allege that the latter two statements are false. |
| 9 | | The Letter states that Camp "***appears*** to have caused NOSSCR and the Foundation to comingle funds." Ex. A, Letter at 5 (emphasis added). That is an opinion based on facts that Insurance Branch discloses in the letter. *See id.* And the Court cannot credit Plaintiffs' bald denial that Insurance Branch's contributions to the Foundation weren't used as promised—Camp does not take issue with the Letter's statements regarding Plaintiffs' employment agreements *with the Foundation*, the lack of other sponsors, and the Foundation's failure to do anything of note consistent with Camp's representations. *See generally* Dkt. No. 1, Compl. ¶¶ 51–57. |

Defendants wish to ensure that at least the following points are not buried in this table's dense summary of Plaintiffs' allegations vis-à-vis the Letter:

- Plaintiffs do not allege that Defendants mischaracterize the terms of their employment agreements *with the Foundation*.

- Plaintiffs do not allege that it is false that Insurance Branch was the Foundation's only sponsor.

- Plaintiffs do not allege that it is false that the Foundation has not done any substantive work consistent with the mission Camp represented to Cassity.

- Plaintiffs do not allege that it is false that Essex is Camp's personal business entity.

- Plaintiffs do not allege that it is false that Camp represented, to Cassity, that contributions to the Foundation would be used for industry education and improvement.

- Plaintiffs do not allege that it is false that Camp directed Insurance Branch deliver specified funds to specified destinations (including Essex, as well as various bank accounts) on identified dates for both NOSSCR and the Foundation as indicated in the Letter.

- Plaintiffs do not allege that it is false that Camp instructed Insurance Branch to deliver NOSSCR Payments, pursuant to the Exhibitor Agreement and other agreements, to a bank account to which Insurance Branch previously delivered Foundation-related funds. *See* Ex. A, Letter at 5.

Without allegations that *these* statements are false, Plaintiffs' defamation claim is revealed for what it is: based exclusively on negligible differences of opinion as to dates and characterizations of

what is "*ad hoc*," or what is "retaliatory." Plaintiffs do not allege that the crux of the concerns Defendants express in the Letter is false.

More to the point, without any allegations supporting *why* the Statements communicate facts (as opposed to opinions, theories, or perceptions) that are verifiably false (in that allegations speaking to falsity are not responsive to the Statement or are, themselves, mere conclusions), Plaintiffs' articulation of the Statements does not raise their likelihood of prevailing above mere speculation. *See Twombly*, 550 U.S. at 555. Even without the judicial proceedings privilege and the common interest privilege, Plaintiffs simply do not allege libel sufficient to survive a motion to dismiss.

**IV.    At a Minimum, the Court Must Dismiss All Claims All Claims Asserted by Waller.**

Finally, as Exhibit B demonstrates, Plaintiffs do not allege a single Statement suggesting that Waller misrepresented anything, comingled anything, misappropriated anything, or did anything illegal, unlawful, untoward, or even questionable. Specifically, the Letter mentions Waller only in the context of her employment agreement with the Foundation, but it does not state that Waller made any representations to Cassity regarding Insurance Branch's contributions to the Foundation or that she even plans any significant role with the Foundation. *See* Ex. A, Letter at 4–5. Plaintiffs do not even allege that Defendants mischaracterized, in the Letter, the terms of her employment agreement with the Foundation. *See id.* Simply put, the Complaint does not allege a defamatory Statement concerning Waller. The Court is therefore obligated to dismiss Waller's claims.

**CONCLUSION**

Demand letters, like the Letter, are not actionable as libel. If they were, parties could never resolve disputes short of litigation. Nor could one party warn another party of suspected—not even

actual, but *suspected* wrongdoing based on direct observation. Claims like those Plaintiffs assert quell constitutionally protected, and salutary, free speech. But even leaving aside high-minded constitutional issues, the Letter isn't defamatory. It communicates concerns and requests (indeed, begs for) dialogue. And Plaintiffs do not allege a verifiably false statement of fact. The Court is obligated to dismiss the Complaint, and at least Waller's claims, as the Letter indisputably doesn't defame her.

## REQUEST FOR ORAL ARGUMENT

Pursuant to LCvR 7(f), Defendants request an oral hearing in connection with this motion.

DATED: January 24, 2025.                    Respectfully submitted,


*/s/ Patrick J. Curran Jr.*
Patrick J. Curran Jr. (DC Bar. No. 1026302)
Davis Wright Tremaine LLP
1301 K Street NW, Suite 500 East
Washington, DC 20005
(202) 973-4200
(202) 973-4299 (facsimile)
patcurran@dwt.com


*/s/ Daniel K. Brough*
Daniel K. Brough (Utah Bar No. 10283)
Bennett Tueller Johnson & Deere
3165 East Millrock Drive, Suite 500
Salt Lake City, UT 84121
(801) 438-2000
(801) 438-2050 (facsimile)
dbrough@btjd.com
*(Pro hac vice admission to be sought)*

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was served upon counsel of record for all parties who have made an appearance via this Court's CM/ECF system.

*/s/ Patrick J. Curran Jr.*
Patrick J. Curran Jr.