EXHIBIT A




**Daniel K. Brough**
**T: 801.438.2024**
**E: dbrough@btjd.com**

October 24, 2024

***Via Email and U.S. Mail***

Rick W. Fleming
National Organization of Social Security Claimants' Representatives
1300 I Street NW, Suite 825
Washington, DC 20005
rwfleming@farrin.com

**Re: Insurance Branch's Response to September 19, 2024, Termination of Premier Exhibitor Agreement**

Dear Mr. Fleming:

This law firm represents Professional Employee Services, LLC d/b/a Insurance Branch ("Insurance Branch"), which has received the National Organization of Social Security Claimants' Representatives' ("NOSSCR") September 19, 2024, notice (the "Notice") of its termination of the March 14, 2024, Premier Exhibitor Agreement (the "Exhibitor Agreement") between Insurance Branch and NOSSCR, effective October 31, 2024.

At the outset, we note that an individual named "Eileen Johnson, counsel for NOSSCR," is copied on the Notice. We are mindful of our obligation to not communicate with individuals or entities that are represented by counsel on the matters that are the subject of the communication. However, the fact that Ms. Johnson is merely copied on the letter does not inform us as to whether she represents NOSSCR regarding the Notice. Nor does it inform us whether she will represent NOSSCR regarding the content of this letter (which is much broader than the Notice). Even if we knew those things, we do not know Ms. Johnson or have her contact information. If we should be communicating regarding these matters with Ms. Johnson or any other counsel for NOSSCR, do not hesitate to alert us (or have such counsel alert us), and we will immediately cease our communication with NOSSCR and direct our communications to that counsel.

Insurance Branch acknowledges the termination described in the Notice. Consistent with the request set forth in the Notice, Insurance Branch will remove all NOSSCR logos and/or marks from its website and marketing materials and will cease all use of such logos and marks. Insurance Branch will return any NOSSCR property in its possession or under its control. However, please note that Insurance Branch is unaware of any such property in its possession or under its control. If NOSSCR wishes to identify any such specific property, Insurance Branch will promptly return it. Insurance Branch appreciates NOSSCR's confirmation that it will do the same with respect to Insurance Branch's logos, marks, and property.

On that topic, NOSSCR's request that Insurance Branch cease use of NOSSCR logos and/or marks invokes another contract: the Corporate Sponsorship Agreement between NOSSCR and






Insurance Branch dated March 11, 2024 (the "Sponsorship Agreement"). We expect that NOSSCR wishes to terminate the Sponsorship Agreement, pursuant to its Section 5.1, in addition to the Exhibitor Agreement. To the extent that is not what NOSSCR intends, Insurance Branch hereby terminates the Sponsorship Agreement pursuant to its Section 5.1. This termination will be effective thirty (30) days after delivery of this communication.

Wrapping up additional loose ends, pursuant to Section 4 of the Exhibitor Agreement, Insurance Branch has delivered five (5) payments of $16,333.00, totaling $81,665.00, to NOSSCR. Given that Insurance Branch will no longer be receiving the benefits of the Exhibitor Agreement, Insurance Branch requests that NOSSCR refund the amounts Insurance Branch has paid pursuant to the Exhibitor Agreement. Please send a check directly to Insurance Branch utilizing the contact information NOSSCR has.

NOSSCR's Notice purports to explain that its decision to terminate the Exhibitor Agreement is a product of NOSSCR's decision to "refrain from all sponsorships or exhibitor agreements pertaining to all Medicare Advantage related subjects and entities until further notice." However, Insurance Branch expects, confidently, that NOSSCR's decision is really a retaliatory measure responding to Insurance Branch's decision to cease funding the NOSSCR Foundation (the "Foundation"), as well as Insurance Branch's alignment with Advocates, Counselors, and Representatives for the Disabled ("ACRD"). Such a retaliatory measure is consistent with the recent actions and conduct of David Camp ("Camp"), NOSSCR's chief executive officer, who has engaged in a consistent, offensive smear campaign to defame Insurance Branch and Brendon Cassity ("Cassity") by disseminating falsehoods about them. Insurance Branch and Cassity expect that Camp's smear campaign is likewise retaliatory in nature and purpose.

In a spirit of collegiality and goodwill, Insurance Branch and Cassity have heretofore refrained from explaining, to NOSSCR and its board, why Insurance Branch ceased funding the Foundation and aligned with ACRD. But in light of NOSSCR's termination of the Exhibitor Agreement and Camp's campaign of defamation, as well as the Notice's explanation that NOSSCR's board voted to terminate the Exhibitor Agreement, Insurance Branch and Cassity deem it appropriate, and perhaps even useful to NOSSCR, to share those reasons now. For this reason, this letter is being sent to all members of NOSSCR's executive committee, as well as its circuit members. However, Cassity has not shared, and does not in the least intend to share, the information contained in this letter with any industry professionals or other third parties (except as expressly noted in the last paragraph of this letter).

As NOSSCR is well aware (hopefully), Camp negotiated, on behalf of NOSSCR and the Foundation, an arrangement with Insurance Branch whereby Insurance Branch would fund and finance the Foundation, in addition to other funding of NOSSCR. This arrangement was in place by March 2022. The express purpose of this funding was to further educational and other industry-benefitting, and industry-supporting, programs. Camp, on behalf of NOSSCR and the Foundation, directly represented this purpose to Cassity on multiple occasions. Camp utilized these representations to secure Insurance Branch's commitment to fund the Foundation. To Cassity's knowledge, at the time Camp secured this commitment, the Foundation had no other sponsors, donors, or other revenue sources. Insurance Branch would be the first—and at that point, the only—one.





Camp was the face of NOSSCR and the Foundation to Insurance Branch and Cassity. He represented those entities and spoke on their behalf. He not only represented the purpose of the funds Insurance Branch would contribute to the Foundation, but he also relayed instructions to Cassity regarding how to deliver payments to the Foundation as well as to NOSSCR pursuant to various arrangements, including the Exhibitor Agreement. Camp's instructions for when, how, and how much Insurance Branch should contribute to the Foundation were *ad hoc*—the timing, amount, and method of delivery of each contribution changed from instance to instance. Notwithstanding, with respect to each contribution, Camp was clear that the Foundation would receive and apply it directly to the Foundation's outreach and educational efforts.

Beginning in March 2022, Insurance Branch delivered funds to NOSSCR for non-Foundation expenses via online invoicing delivered from a NOSSCR email address. Payments earmarked for the Foundation were delivered to what Insurance Branch understood was a Foundation bank account at PNC Bank. Insurance Branch made such payments made on March 26, 2022, April 25, 2023, and June 2, 2023, each for different amounts totaling $73,000.00. However, on or about June 8, 2023, Camp instructed Insurance Branch to deliver Foundation contributions to an entity Camp called Essex Strategies ("Essex"). When Cassity questioned why Camp requested funds to be sent to Essex, rather than directly to the Foundation at its PNC Bank account, Camp explained to Cassity that Essex was affiliated with, or related to, the Foundation. Relying upon Camp, Cassity approved two payments by Insurance Branch to Essex on June 8, 2023, and July 10, 2023, totaling $70,000.00. Cassity did so with the expectation that those funds were to be accounted for as contributions or donations to the Foundation.

Subsequently, on or about July 18, 2023, Camp instructed Insurance Branch to deliver Foundation contributions to a third bank account, at Bank of America, with an account number ending with 2664. Insurance Branch delivered two payments, on July 18, 2023, and August 21, 2023, totaling $125,000.00, to that account.

By this point, Cassity had grown frustrated and concerned with Camp's practice of simply asking for different amounts of contributions at different times, as well as his practice of asking Insurance Branch to deliver contributions to destinations that, facially, were not affiliated with the Foundation. He had also received no information regarding the Foundation's use of the contributions. Beginning in August 2023, Cassity declined to direct Insurance Branch to make further contributions to the Foundation until he could obtain some definiteness in the arrangement and some reporting as to the contributions' use. Insurance Branch's last payment to the Foundation occurred on August 21, 2023.

Cassity and Camp met in person on November 10, 2023. Cassity requested this meeting to discuss and agree upon specific procedures for Insurance Branch's contributions to the Foundation, as well as to obtain an update on how the Foundation had used contributions to that point. During that meeting, Camp acknowledged and expressed gratitude for Insurance Branch's contributions to the Foundation and reiterated that the Foundation was using those contributions for industry education, outreach, and support. Camp further explained that the Foundation had used Insurance Branch's contributions to that point exactly for that purpose. Aiming to lend some concrete parameters to the





arrangement between the Foundation and Insurance Branch, Cassity and Camp ultimately agreed that Insurance Branch would fund the Foundation at a rate of $30,000.00 per month, in addition to Insurance Branch's separate efforts to fund NOSSCR. Camp suggested the figure of $30,000.00 per month. At that point, Cassity was unaware of any other NOSSCR sponsors or any work the Foundation had performed.

However, on November 13, 2023—three days after his meeting with Camp—Cassity obtained Camp's employment agreement with the Foundation, dated August 4, 2023 (the "Camp Employment Agreement"), and the employment of Laura Beth Waller ("Waller"), dated August 5, 2023 (the "Waller Employment Agreement"). He received them from a third party, not from either Camp or Waller. The Camp Employment Agreement provides for a default base salary of $1,250.00 per month. However, "[i]f and when the Foundation consistently receives $15,000.00 per month or more in revenue/contributions/donations, the base salary of [Camp] shall be $5,000.00 per month." Additionally, if "the Foundation consistently receives $30,000.00 per month or more in revenue/contributions/donations, the base salary of [Camp] shall be $18,750.00." The Waller Employment Agreement sets forth a similar benchmark structure: a default base salary of $500.00 per month; a salary of $2,000.00 per month if the Foundation's "revenue/contributions/donations" consistently reached $15,000.00 per month; and a salary of $8,333.00 per month if the Foundations "revenue/contributions/donations" consistently reached $30,000.00 per month. Both the Camp Employment Agreement and the Waller Agreement further allotted Camp and Waller, respectively, $500.00 per month each for benefits.

Some quick math led Cassity to disturbing realizations. The $30,000.00 monthly "revenue/contributions/donations" benchmark contained in the Camp Employment Agreement and the Waller Employment Agreement precisely matched the $30,000.00 monthly commitment Camp had obtained from Insurance Branch. At a "revenue/contributions/donations" benchmark of $30,000.00 per month—which, as of the date Camp secured Insurance Branch's commitment, would have come only from Insurance Branch—Camp would receive total annual compensation of $231,000.00, and Waller would receive total annual compensation of $105,996.00, for a total (between the two of them) of $336,996.00 per year. Out of the total of $360,000.00 that Insurance Branch would contribute to the Foundation annually, only $23,004.00 would remain—not nearly enough to meaningfully deliver any of the services and support Insurance Branch and Cassity had been led to believe the Foundation would deliver. And even that amount would be decimated by payroll taxes attributable to Camp's and Waller's compensation, likely leaving the Foundation in the red.

During their November 10, 2023, meeting, Camp did *not* tell Cassity that, just a few months earlier, he and Waller had executed employment agreements with the Foundation that meant, practically, that 100% of Insurance Branch's contributions were doing no more than lining Camp's and Waller's pockets. Camp said what he said to Cassity at that November 10, 2023, meeting knowing full well that every dollar Insurance Branch contributed was to compensate Camp and Waller, and nothing else. In other words, contrary to what Camp represented to Insurance Branch and Cassity, Insurance Branch wasn't funding the Foundation or its outreach to the industry. Instead, it was exclusively funding salaries—pretty generous salaries at that—for Camp and Waller. Of course, as NOSSCR is (or should be) aware, the Foundation has engaged in, at most, minimal outreach to the





industry. In fact, it has done virtually nothing—certainly nothing for which Insurance Branch's contributions would be used.

Deeply concerned by what he had learned, Cassity researched Essex. As it turns out, Essex is not in the least affiliated with the Foundation. Instead, Essex is a limited liability formed in Missouri—Camp's home state. Public documents list Camp as Essex's sole principal. Essex is *Camp's personal entity*. Based on Camp's representations and instructions, Insurance Branch paid $75,000.00 to Camp's personal entity on the assumption that those funds would be contributions to the Foundation. Facially, they weren't. This realization cast a shadow on all funds that Insurance Branch has ever paid to NOSSCR or the Foundation pursuant to Camp's direction.

Camp's pattern of designating multiple accounts to which Insurance Branch would make payments continued even after November 2023. Following a January 8, 2024, payment of $10,000.00 to NOSSCR through NOSSCR's online invoicing system, Camp instructed Insurance Branch to deliver payments pursuant to the Exhibitor Agreement (and the Sponsorship Agreement, at an additional $1,000.00 per month) to yet another bank account—an account at Bank of America with an account ending with 9593. Those payments, pursuant to the Exhibitor Agreement and the lease agreement, would be attributable to NOSSCR, not the Foundation, pursuant to Insurance Branch's agreements with NOSSCR. However, on or about June 18, 2024, Camp instructed Insurance Branch to deliver payments pursuant to the Exhibitor Agreement and the lease agreement to the Bank of America account ending with 2664, to which Insurance Branch had previously delivered payments intended for the Foundation. Insurance Branch delivered these payments in reliance upon Camp's instructions. It is noteworthy that Camp asked Insurance Branch to deliver Exhibitor Agreement and Sponsorship Agreement-related funds (for NOSSCR) to an account at which the Foundation had previously received contributions in light of Insurance Branch's prior cessation of payments to the Foundation—ostensibly, because the Foundation likely had no income, it is similarly likely neither Camp nor Waller had any income from the Foundation either.

In summary (1) Insurance Branch paid Essex, *Camp's personal entity*, $75,000.00 that should have gone to the Foundation, on Camp's instructions; and (2) regardless of the funds' destination, Insurance Branch paid not less than $268,000.00 earmarked for the Foundation on the premise that those funds were to be used for the Foundation's industry outreach and support, not Camp's and Waller's personal salaries. Given Camp's repeated shifting of payment instructions—between his personal entity and at least three other accounts, including the indisputable use of one account to receive funds for both NOSSCR and the Foundation—Insurance Branch lacks any confidence that *any* of the funds it thought it paid to the Foundation (or to NOSSCR, really) made it to their proper destination. At best, Camp appears to have caused NOSSCR and the Foundation to comingle funds. At worst, he affirmatively diverted funds from Insurance Branch to himself. And whatever amounts Camp succeeded in persuading Insurance Branch to pay for the Foundation's benefit, he did so by employing a false representation as to the funds' use.

For those reasons, Insurance Branch continued to make payments to NOSSCR pursuant to the Exhibitor Agreement and the Sponsorship Agreement (which have now been terminated), but did not





make another contribution to the Foundation after its August 21, 2023, contribution. It is also for these reasons that Insurance Branch aligned with ACRD.

To be abundantly clear, in this letter, Insurance Branch and Cassity report only those facts of which they possess firsthand knowledge. The conclusions they draw from those facts are merely opinions based on those facts. It's certainly possible that Insurance Branch's contributions to the Foundation made it—however convoluted the path—to the Foundation, and that the Foundation used them for the purposes Camp represented. It's also possible that Camp and Waller didn't take salaries or compensation from Foundation until after July 2024. Insurance Branch does not know these facts, and nobody would be more pleased to learn them. But those felicitous outcomes seemed only remotely likely to Cassity in November 2023, and they seem only remotely likely now. Putting a fine point on it (1) Camp's use of multiple bank accounts to receive Insurance Branch's contributions; (2) his insertion of his own business entity to receive Insurance Branch's contributions; (3) the ad hoc nature of Camp's instructions (in amount as well as timing and payment destination); (4) his failure to voluntarily disclose his and Waller's employment agreements with the Foundation for months; (5) the Foundation's lack of other sponsors; (6) the Foundation's failure to accomplish much, if anything, of what it stated were its goals; and (7) the mighty coincidence that Camp asked Insurance Branch to fund the Foundation *at the exact same monthly rate* that would allow him to maximize the Foundation's contribution to him and to Waller, even though the Foundation had no other sponsors and no real operations, together formed a bridge too far for Cassity to cross.

Insurance Branch and Cassity expressly request that NOSSCR and its board *not* draw any conclusions based on the contents of this letter. Instead, they expressly request that NOSSCR and its board perform their own thorough, searching, independent investigation. And as stated above, Cassity has not shared, and has no plans to share, the contents of this letter except as expressly stated in the last paragraph of this letter. Insurance Branch and Cassity expect that NOSSCR and the board will likewise not disseminate this letter except as necessary.

Nevertheless, for the reasons stated herein, Insurance Branch requests that in addition to the $81,665.00 to be refunded due to the Exhibitor Agreement's termination, NOSSCR or the Foundation further refund the sum of $268,000.00, *and* that NOSSCR and the Foundation submit to—and give Insurance Branch full access to—a complete audit and accounting, performed by a professional of Insurance Branch's choosing, of NOSSCR's and the Foundation's receipt and use of all funds imparted to them by Insurance Branch or any related individual or entity since the Foundation's creation. In the event this audit reveals additional diverted funds, Insurance Branch will supplement and update its request for a refund to include those additional funds. NOSSCR and the Foundation should be interested in conducting this audit for their own benefit, and they may even wish to expand the scope of the audit described in this letter to ensure that all funds flowing in and out of each of them are both proper and properly accounted. And again, if this audit, and NOSSCR's investigation, reveal that Insurance Branch and Cassity have misinterpreted the facts that he presents herein, Cassity will be pleased to be corrected—so long as that correction is documented rather than simply claimed.





Given the implications of Camp's financial management of NOSSCR and the Foundation (as well as other issues), Cassity has reported the information contained in this letter to pertinent governmental authorities, which can respond to this information in whatever way they deem best.

Sincerely,

BENNETT TUELLER JOHNSON & DEERE

Daniel K. Brough

DKB/hvl

cc: Client
Paul Burkhalter (via email only: PBurkhalter@morganweisbrod.com)
Ted Norwood (via email only: ted@ibionline.com)
Rob Wendt (via email only: RWendt@finkellaw.com)
Patrick O'Neal (via email only: poneal@mcdonaldlawfirm.com)
Christine Burnside (via email only: christineburnside@deutermanlaw.com)
Crysti Farra (via email only: cdf@cdfarra.com)
Julie Burkett (via email only: jburkett@burkettfirm.com)
Douglas Mohney (via email only: dmohney@avardlaw.com)
Steve Perrigo (via email only: s.perrigo@allsup.com)
Ann Atkinson (via email only: ann@atkinsonlegal.com)
Sarah Park (via email only: sarah@wpmlegal.com)
Gary Jones (via email only: gary@lawcenter-ss.com)
Ashley Hartman Sappenfield (via email only: ahartman@lanierlawgroup.com)
Chris O'Connor (via email only: coconnor@citizensdisability.com)
Rezwanul Islam (via email only: rislam@nsls.legal)
Tom Giordano (via email only: tgiordano@pondlehocky.com)
Natalie Keeve (via email only: Natalie.Keeve@nymanturkish.com)
Michael Liner (via email only: mliner@linerlegal.com)
Meredith Marcus (via email only: mmarcus@obd.law)
Kevin Kerr (via email only: kevin.kerr@nwdisabilitybenefits.com)
Suzanne Zalev (via email only: szalev@baylegal.org)
Miles Mitzner (via email only: miles@mitzner.com)
George Piemonte (via email only: gpiemonte@mjpdisability.com)